MARY E. MILLER
*vs.*
CLARENCE E. DORE

Somerset.   Opinion, February 4, 1959.

*Lloyd H. Stitham,*
*Bird & Bird,* for plaintiff.

*Locke, Campbell, Reid & Hebert,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

DUBORD, J. The defendant is a medical doctor engaged in general practice in the city of Waterville. Plaintiff was a married woman, who had previously given birth to two other children and sometime in January 1956 she consulted the defendant and engaged him to attend her in an expected confinement. The evidence indicates the defendant had estimated the awaited child would be born on or about May 16, 1956.

On Saturday, May 19, 1956, the defendant feeling tired out physically from overwork, and in need of a rest, decided to go to Moosehead Lake for a two day fishing trip. He did not personally notify the plaintiff that he would be unavailable during the two days in question. However, before he left, he made arrangements with Dr. Kenneth W. Sewall, head of the obstetrical department of Thayer Hospital of Waterville, for the attendance by Dr. Sewall of defendant's maternity cases during his absence. On the eve of May 20, 1956, the plaintiff became aware of the fact that her accouchement was approaching. Previous reservations having been made by the defendant for the reception of the plaintiff at Thayer Hospital, early in the morning of May 20, 1956, she entered the hospital. Dr. Sewall having been notified, gave instructions concerning medication to alleviate pain and sometime during the forenoon saw the plaintiff at the hospital. When he saw her, she was already on the delivery table ready for the birth of the child. The physician who attended the plaintiff was Dr. Edward M. Southern, associate of Dr. Sewall, and a medical doctor with a good background in the practice of obstetrics. When Dr. Sewall entered the delivery room, Dr. Southern was preparing delivery and upon being assured that "everything was all right," Dr. Sewall left the room. Dr. Southern testified that he saw the plaintiff in the labor room and introduced himself to her and informed her that he would attend

her. At that time it was a few minutes after 11:00 a.m. The doctor noting that delivery was imminent, ordered that she be moved to the delivery room where a healthy child was born within a very few minutes.

The defendant returned to Waterville that night and resumed the attendance of the plaintiff for post natal care.

Plaintiff brought an action against the defendant for breach of contract and based her claim upon the theory that the defendant had agreed to give her ether or gas at the time of her delivery; that his substitute failed to administer this type of anaesthetic, and that as a result she suffered pain, both mental and physical, which otherwise she would not have experienced. She also charged that the defendant failed to notify her that he would be unavailable and thus permit her an opportunity to employ another physician of her own selection, and she further charged that she suffered severe pain and mental anguish, all resulting from defendant's failure to attend her at the time of her labor and delivery of the child.

Subsequently, she was permitted to amend her writ by the addition of another count alleging that Dr. Southern was the agent of the defendant. The jury was instructed by the presiding justice to disregard this additional count on the theory that there was no proof of agency. To this instruction the plaintiff excepted, but the jury having returned a verdict for the plaintiff, this exception was not pressed.

It is clear from the nature of the pleadings and the manner in which the case was tried that plaintiff's claim was predicated in large measure upon an alleged breach of a contract to administer ether or gas. However, we treat the pleadings as broad enough to include an alleged breach of contract, both by reason of alleged failure to give gas or ether, and also failure to notify the plaintiff that he would

be unavailable and that pain was suffered by reason of defendant's absence at the time of her delivery.

The jury returned a verdict for the plaintiff and the defendant filed a general motion for a new trial. Exceptions were taken by the defendant to an instruction given by the presiding justice, and also to the refusal of the presiding justice to give certain requested instructions.

We give our attention first to plaintiff's contention that the defendant had agreed to give her gas or ether during the time of her delivery. The only allegation in her writ bearing upon this contention reads as follows:

> "That during the term of her pregnancy, the defendant told the plaintiff that gas or ether would be used at the time of delivery, so that plaintiff would have no pain or suffering at the time of delivery."

There is no averment in the declaration that the defendant agreed to give her gas or ether. However, if the allegation can be construed as being broad enough to allege an agreement that gas or ether would be administered, the evidence is entirely bare of any evidence supporting such a contention. The only evidence in the record is the testimony of the plaintiff, in which she said:

> "I asked him (defendant) finally if he gave ether or something, is the way I put it."

He said:

> "Nowadays they give a mixture of ether and gas."

We are, therefore, convinced that the evidence does not support a finding that the defendant had agreed to give gas or ether.

We give our attention now to some of the rules of law applicable to the relationship of physician and patient, a relationship which is a personal one and which creates obliga-

tions which vary from those arising from an ordinary commercial agreement.

The decisions in diverse jurisdictions are conflicting and difficult of reconciliation. That opinions of courts vary is not only due to the fact that dissimilar rules are adopted in different jurisdictions, but the facts and circumstances of each case are not always the same. Moreover, some actions are based upon negligence, while others as in the instant case, are founded upon an alleged breach of contract. Some actions have been brought against physicians alleging negligence, or breach of contract, for abandonment of the case. Others are predicated upon the temporary absence of the attending physician. In the instant case, we are no concerned with abandonment, but with a temporary leaving of the patient on the part of the defendant. As previously pointed out, the evidence discloses that shortly after the birth of the child, the defendant resumed the attendance of the patient, and insofar as the record indicates, without complaint on the part of the plaintiff.

The following are general rules applicable to the relationship between physician and patient:

> "It is the settled rule that one who engages a physician to treat his case impliedly engages him to attend throughout that illness, or until his services are dispensed with. In other words, the relation of physician and patient, once initiated, continues until it is ended by the consent of the parties, revoked by the dismissal of the physician, or until his services are no longer needed." 41 Am. Jur. 194, Physicians and Surgeons, § 72.

> "A physician has a right to withdraw from a case, but if he would discontinue his services before the need for them is at an end, he is bound first to give due notice to the patient and afford the latter ample opportunity to secure other medical attendance of his own choice." 41 Am. Jur. 194, Physicians and Surgeons, § 72.

"If a physician abandons a case without giving his patient such notice and opportunity to procure the services of another physician, his conduct may subject him to the consequences and liability resulting from abandonment of the case." 41 Am. Jur. 194, Physicians and Surgeons, § 72.

"The relation of physician and patient continues until terminated in modes recognized by law. And it is the universal rule that a physician cannot discharge himself from a case and relieve himself of responsibility for it by simply abandoning it or staying away without notice to the patient." 41 Am. Jur. 217, Physicians and Surgeons, § 102.

"A physician or surgeon who leaves or abandons his patient in a critical stage of disease, without reasonable notice to enable the patient to secure another medical attendant, when the giving of such notice is reasonably possible, is guilty of culpable dereliction of duty, and, if damages are occasioned thereby, is liable therefor." *Stohlman* v. *Davis,* 220 N. W. 247, (Nebr.)

See also *Barbour* v. *Martin* (1873), 62 Me. 536, 141 A. L. R. 139.

In the instant case, the attending physician, without notice to his patient left for a short fishing trip and before his departure he made arrangements with the head of the obstetrical department of Thayer Hospital to attend to his patients. It was conceded that the substitute was a competent one.

In 57 A. L. R. (2nd) 417, we find the following statement as to the law applicable in a case similar to the instant one:

"In a number of cases the question arose whether the fact that a physician temporarily leaves his practice renders him liable on the ground of lack of diligence in attending the patient, where before doing so he arranges for another physician to take his place. As to this question, the general rule seems to be that a physician is not liable for lack of

> diligence in attending a patient if he temporarily leaves or interrupts his practice, provided (1) he makes proper provision for the attendance of a competent physician during his absence in case of a call, (2) timely informs his patient of his unavailability and the substitution, and (3) does not absent himself while a patient is in a critical condition."

We adopt the foregoing rule. As to what is meant by "timely notice" would depend upon the circumstances of the case. It should be a notice given in sufficient time to enable the patient to engage another physician of his or her own choice, in the event the substitute is not acceptable. Whether or not the notice was a timely one might well be a jury question depending upon the existing exigencies and circumstances. Moreover, we do not think the notice need necessarily be given directly to the patient, as long as it is conveyed to the patient in ample time.

It is to be noted that if an attending physician is to excuse his temporary absence, he must comply with all three of the requirements of the foregoing rule. Manifestly, if the substitute is competent and is acceptable to and accepted by the patient, then the physician is exonerated from liability. Presumably, a physician could protect himself when he is first engaged, or during the progress of the treatment, particularly in confinement cases, by giving his patient the name of a proposed substitute, in the event it becomes necessary for him to absent himself temporarily. Assent on the part of the patient would cover the situation and afford the attending physician the necessary protection.

During the trial of the instant case, the presiding justice instructed the jury that defendant would be absolved from responsibility if the jury found from the evidence that the defendant had either notified the plaintiff in reasonable time to allow her to engage another doctor for her delivery, or if he had arranged for a competent substitute. It will be

noted that this instruction is more favorable to the defendant than would have been an instruction based upon the rule we have just enunciated. However, the presiding justice qualified the foregoing instruction with the following statement:

"If the defendant doctor did procure a substitute competent doctor to attend his patient, then it was the duty of the defendant doctor to notify the substitute doctor of the agreed specific undertaking, of the manner of treatment to be given and the anaesthesia to be used, if such you find to be a part of the contract. If such notice was not given by the defendant doctor to the substitute doctor, or if the plaintiff was delivered by a volunteer with whom the plaintiff made no contract to deliver her, and a different anaesthesia was used, then the plaintiff would be entitled to recover for the greater physical pain and suffering, if any, that was present, which would not have been present if the contracted specific anaesthesia had been used, if you should so find greater physical pain and suffering."

In view of the charge in relation to the duty of the defendant to inform his substitute of the nature of any existing contract to administer ether or gas, as the case was tried almost completely upon plaintiff's contention that there was such a contract, it seems clear that the jury would not have returned a verdict for the plaintiff without finding that such a contract existed. We have already determined that the evidence does not support such a finding.

The record is replete with page after page of testimony given by different physicians concerning varying types of anaesthesia used in childbirth cases. The jury may well have been confused by this mass of perplexing testimony.

It is impossible for us to determine upon what hypothesis the jury returned a verdict for the plaintiff. If the underlying reason is a finding that a contract to give ether

or gas existed, then the jury erred. If the jury based its verdict upon the theory that the defendant had violated any of the rules of law applicable to the relationship between physician and patient, again it was in error as there is no evidence in the case to show that the plaintiff would have suffered less or escaped any of the elements of damage for which she seeks recovery had the defendant attended her in person during the interval of his absence. See *Jackowicz* v. *Knobloch*, 275 Mich. 125, 265 N. W. 799; *Bonnor* v. *Conklin*, 62 F. (2nd) 875.

In either event the verdict was erroneous. It has all the earmarks of an ill considered finding.

The entry will be

*Motion sustained.*
*Verdict set aside.*
*New trial ordered.*